Clement & Murphy
PLLC

February 20, 2026

**VIA CM/ECF**

David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

  Re: *The Town of Pine Hill, Alabama v. 3M Company*, No. 25-10746

Dear Mr. Smith:

  The Sixth Circuit's recent decision in *Ohio ex rel. Yost v. Ascent Health Services, LLC*, 165 F.4th 999 (6th Cir. 2026), supports reversal here. In *Yost*, Ohio sued pharmacy benefit managers ("PBMs") for alleged drug price inflation based on their negotiations with private clients, while expressly disclaiming any challenge to "the operation or administration of federal health benefits programs." Op.3. The PBMs removed on federal-officer grounds, alleging that their handling of private and federal benefits was intertwined. Op.2-3. The Sixth Circuit reversed the district court's remand order, holding that the defendant's allegations and "theory of the case" must be credited, and that Ohio's disclaimer must be rejected. Op.9-10.

  *Yost* confirms three important principles that are decisive here. *First*, a plaintiff's "disclaimer" cannot defeat federal officer removal where federal and non-federal activities are plausibly alleged to be "indivisible." Op.9-10. "When the applicability of the disclaimer turns on whether the defendant's actions are in fact related to conduct undertaken under color of federal office, a remand would mean denying the defendant a chance to present his federal defenses in federal court." Op.10. *Second*, courts must credit the removing defendant's allegations and theory of the case, especially concerning the "indivisibility" of federal and non-federal conduct. Op.10. *Third*, the federal removal statute requires "only an association, connection, or tie between the challenged conduct and the defendant's acts under color of federal office." Op.9-14.

  Together, these principles mandate reversal here. 3M's plausible allegations in its removal notice that AFFF and non-AFFF PFAS are inextricably intertwined must be credited. Accordingly, when the Town of Pine Hill seeks to hold 3M liable for alleged contamination from its non-AFFF-PFAS production, "it unavoidably also challenges" 3M's AFFF-PFAS production "and necessarily reaches federally controlled conduct." Op.9. The Town of Pine Hill cannot deprive 3M of a federal-court forum to determine the extent to which PFAS can be traced to AFFF by substituting state-court litigation over the scope of its disclaimer for federal-court litigation over the scope of 3M's federal defense. This case belongs in federal court.

706 Duke Street • Alexandria, VA 22314
202.742.8900 • www.clementmurphy.com

                                          Respectfully,

                                          <u>s/Paul D. Clement</u>
                                          Paul D. Clement

                                        *Counsel for Defendants-Appellants*

Cc: All Counsel of Record

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0026p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

STATE OF OHIO, ex rel. DAVE YOST, Attorney General of Ohio,

        *Plaintiff-Appellee*,

    *v.*

ASCENT HEALTH SERVICES, LLC; EXPRESS SCRIPTS, INC.; CIGNA GROUP; EVERNORTH HEALTH, INC.; PRIME THERAPEUTICS LLC,

        *Defendants-Appellants*.

No. 24-3033

---

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:23-cv-01450—Michael H. Watson, District Judge.

Argued: December 11, 2025

Decided and Filed: January 27, 2026

Before: SUTTON, Chief Judge; BOGGS and BLOOMEKATZ, Circuit Judges.

---

## COUNSEL

**ARGUED:** Daniel J. Howley, RULE GARZA HOWLEY LLP, Washington, D.C., for Appellants. Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Daniel J. Howley, Charles F. Rule, Emily M. Renzelli, Benjamin Z. Bergmann, Erica N. Baum, RULE GARZA HOWLEY LLP, Washington, D.C., Jaime Stilson, DORSEY & WHITNEY LLP, Minneapolis, Minnesota, Matthew L. Jalandoni, W. Benjamin Reese, FLANNERY GEORGALIS LLC, Columbus, Ohio, David J. Butler, TAFT STETTINIUS & HOLLISTER LLP, Columbus, Ohio, Jeanne M. Cors, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellants. Michael J. Hendershot, T. Elliot Gaiser, Jennifer L. Pratt, Sarah Mader, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

Case: 24-3033     Document: 75-2     Filed: 01/27/2026     Page: 2

No. 24-3033          *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*          Page 2

---

**OPINION**

---

SUTTON, Chief Judge. The State of Ohio filed this lawsuit in state court, alleging that a group of healthcare firms conspired to drive up prices of prescription drugs in violation of several Ohio laws. The defendant firms include two Pharmacy Benefit Managers, known in the industry as PBMs, that negotiate with drug companies to provide prescription drug coverage for federal employees. The PBMs removed the case to federal court under the federal officer removal statute. Ohio moved to remand, arguing that its complaint does not impose liability on any conduct undertaken at the direction of a federal officer. We conclude that it does and reverse the district court's contrary determination.

I.

American consumers usually receive health coverage from private insurers, unions, or employers. In return for premiums, these "plan sponsors" offer consumers a range of benefits. Health coverage often includes reduced-cost access to prescription drugs and the option to purchase drugs at a lower copay from a network of retail pharmacies.

Pharmacy Benefit Managers act as middlemen. They negotiate with drug manufacturers on behalf of plan sponsors. In doing that work, PBMs typically create "formularies," what amount to listed drugs that covered consumers can purchase for lower copays. R.1-3 ¶ 73. Because consumers understandably prefer to pay for medication with as little money as possible out of their own pocket, drugs included on formularies benefit from increased demand. And because drug manufacturers understandably want to sell more of their products, they are incentivized to get their products listed on the formularies. That reality gives the PBMs leverage to negotiate "rebates"—post-sale discounts based on the number of consumers that purchased the manufacturers' drug—from drug manufacturers in exchange for inclusion on the PBM's formularies. R.1-3 ¶ 60.

PBMs also administer "pharmacy networks," lists of preferred pharmacies that offer lower prescription copays for consumers with certain health coverage. The same dynamic emerges.

Case: 24-3033     Document: 75-2     Filed: 01/27/2026     Page: 3

No. 24-3033          *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*          Page 3

Consumers want the lower prices available at in-network pharmacies. Pharmacies want increased demand. And PBMs leverage these incentives to extract discounts.

Prime Therapeutics and Express Scripts are PBMs. They offer services to private clients as well as to plan sponsors that contract with the Office of Personnel Management under the Federal Employees Health Benefits Act, sometimes referred to as FEHBA, to provide health insurance to federal employees. Express Scripts also provides PBM services to the Department of Defense as part of its TRICARE health-insurance program for active duty and retired members of the Uniformed Services and their spouses and children.

Ohio filed this lawsuit in state court against the PBMs and other defendants, alleging unlawful pharmaceutical clawbacks, unlawful pharmacy fee adjustments, unduly high prices, deceptive acts, and violations of its antitrust statute. According to the complaint, the PBMs forced higher list prices by demanding significant rebates from manufacturers while tying the amount of the rebates to the list price of the drug. But they allegedly pocketed many of the rebates rather than passing them to the carriers. Making matters worse, Ohio claims, the PBMs separately used their power over pharmacies to demand fees and payments based on sales previously made.

Two defendants—Express Scripts and Prime Therapeutics—removed the case to federal district court under the federal officer removal statute. 28 U.S.C. § 1442(a)(1). The State moved to remand. In the motion, it disclaimed that its claims challenged "the operation or administration of federal health benefits programs such as TRICARE or FEHB." R.40 at 10. In ruling on the motion, the district court noted that the PBMs asserted that they conducted a single negotiation on behalf of all their clients. But that reality, in its view, "does not mean that they cannot conduct negotiations differently pursuant to a [Ohio state] court order." R.97 at 6 (quotation omitted). Concluding that the disclaimer eliminated any potential liability for acts undertaken at the direction of a federal officer, the district court remanded the case to state court. The PBMs appeal.

II.

In relevant part, § 1442 permits a state-court defendant to remove lawsuits or prosecutions against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office."

Case: 24-3033    Document: 75-2    Filed: 01/27/2026    Page: 4

No. 24-3033    *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*    Page 4

28 U.S.C. § 1442(a)(1). To remove a lawsuit under this statute, the defendant thus must establish: (1) that it is a federal officer or a "person acting under" a federal officer, (2) that the lawsuit is directed at conduct "for or relating to any act under color of [federal] office," and (3) that it involves a colorable federal defense. *Id.* While the statute "deal[s] with individuals," it "vindicates . . . the interests of government itself," for "upon the principle that it embodies may depend the possibility of the general government's preserving its own existence." *Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960) (Friendly, J.) (quotation omitted). That does not mean § 1442 expresses doubt as to the competence and fairmindedness of state courts. *See Colorado v. Symes*, 286 U.S. 510, 518 (1932). Indeed, by allowing the Congress to create (or not create) inferior federal tribunals, the Constitution itself presumes the competence of state forums. *See* U.S. Const. art. III, § 1; *cf. Printz v. United States*, 521 U.S. 898, 907 (1997). The officer removal statute instead guards against the possibility that, in particular cases, a state court's adjudication of a federal officer's defense could "paralyze the operations of the government." *Tennessee v. Davis*, 100 U.S. (10 Otto) 257, 263 (1879).

A notice of removal requires a "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). When a defendant removes, we consider its jurisdictional allegations under the same standards that we would apply at the pleading stage. *See Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014). We review the district court's remand order with fresh eyes. *Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 851 (6th Cir. 2023).

### III.

*Person acting under an officer of the United States.* The PBMs are persons who acted under an officer of the United States. A person "act[s] under" a federal officer when he makes "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007); *see Maryland v. Soper*, 270 U.S. 9, 22 (1926). That includes private firms, which are "person[s]" within the meaning of the statute. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *see Watson*, 551 U.S. at 147–48. The statute requires a "relationship" to the federal superior characterized by "subjection, guidance, or control." *Watson*, 551 U.S. at 151 (quotation omitted). The relationship typically arises when a private

Case: 24-3033   Document: 75-2   Filed: 01/27/2026   Page: 5

No. 24-3033    *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*    Page 5

contractor performs a task that "the Government itself would [otherwise] have had to perform." *Id.* at 154.

The PBMs "act[ed] under" a federal officer. 28 U.S.C. § 1442. The Federal Employee Health Benefits Act creates a "comprehensive program of health insurance for federal employees" and "assigns to OPM [Office of Personnel Management] broad administrative and rulemaking authority over" that program. *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 91 (2017) (quotation omitted). The Office of Personnel Management cannot "negotiat[e] and regulat[e] health-benefits plans for federal employees" without negotiating prescription drug prices. *See Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 683 (2006); 5 U.S.C. § 8902(a); OPM, FEHB Program Carrier Letter, Letter No. 2024-05 (Feb. 12, 2024), https://perma.cc/EFS4-NGSW. To fulfill its duties, the Office of Personnel Management contracts with private carriers and authorizes them to subcontract with PBMs to provide coverage. 5 U.S.C. § 8902(a).

The Office mandates many of the terms in those subcontracts and controls the PBMs' conduct as a result. It caps the amount that PBMs may charge carriers for their services. It forbids PBMs from setting prices for carriers based on industry benchmarks (which are higher) and instead ties reimbursement to the PBM's acquisition cost plus a dispensing fee. It forces the PBMs to pass all "negotiated discounts, rebates, credits, or other financial benefits" on to the carrier. FEHB Standard Contract 1.28(a)(2). It demands extensive disclosures of costs, profits, fees, negotiated rebates, and revenues, as well as "the right to review and receive any information and/or documents the Carrier receives from the PBM," *id.* at (a)(7). It can and does audit PBMs. And it requires PBMs to meet at a "minimum" OPM's standards for "member inquiry, telephone customer service" and "paper claims processing." *Id.* at (c).

That contractual control satisfies the statute's "act[ing] under" prong when the PBMs negotiate with drug manufacturers. When the PBMs negotiate with drug manufacturers, they play a key role in the Office of Personnel Management's "effort to . . . carry out" its FEHBA duties of providing prescription-drug benefits. *See Watson*, 551 U.S. at 152; *see also* Federal Employees Health Benefits Acquisition Regulation, 70 Fed. Reg. 31374, 31375 (June 1, 2005). When the PBMs negotiate with drug manufacturers, put differently, they perform a task that the government itself would otherwise have to perform. *See Bennett*, 607 F.3d at 1087. And they do so within a

Case: 24-3033   Document: 75-2   Filed: 01/27/2026   Page: 6

No. 24-3033         *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*         Page 6

regulatory framework that subjects them to the government's "guidance" and "control." *Watson*, 551 U.S. at 151.

Express Scripts' pharmacy negotiations under the TRICARE program unfolded under similar federal control. The Department of Defense bars Express Scripts from collecting "fees, rebates, discounts, or premiums specific to processing TRICARE prescriptions." R.1-7 at 239. It forbids Express Scripts from "negotiat[ing] or collect[ing] any pharmaceutical rebates from . . . network pharmacies on behalf of the Government or for itself." R.1-7 at 239. It mandates the number and location of the pharmacies Express Scripts adds to the network as well as the minimum quality of services the pharmacies must provide. It maintains comprehensive rights to information and frequently audits Express Scripts. And it separately requires Express Scripts to perform audits at its direction. The PBM, in short, operates under the Department of Defense's "subjection, guidance[,]" and "control." *Watson*, 551 U.S. at 151; *see Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251–53 (4th Cir. 2021).

Our decisions in *Bennett v. MIS Corp.* and *Mays v. City of Flint* illustrate the two sides of the acting-under-a-federal-officer line. In *Bennett*, the Federal Aviation Agency hired private firms to deal with a mold infestation in one of its control centers. The contractors succeeded only in "disastrous[ly] causing toxic mold to spread throughout the tower." 607 F.3d at 1082 (quotation omitted). When affected federal employees filed a lawsuit over the contamination, we allowed removal based on the federal agency's "detailed regulation, monitoring, [and] supervision" of the contractors' work. *Id.* at 1088. In *Mays*, by contrast, the Michigan Department of Environmental Quality attempted to remove state tort actions arising out of the Flint water crisis. 871 F.3d 437, 440 (6th Cir. 2017). We remanded the case back to state court. *Id.* "[R]epeated written and verbal dialogue" between the Michigan agency and the federal Environmental Protection Agency, we explained, did not establish that the former acted under the latter. *Id.* at 441.

The PBMs' case for removal has much in common with *Bennett* and little in common with *Mays*. As in *Bennett*, the PBMs operate under "explicit parameters" set by the federal government. 607 F.3d at 1087. Not so in *Mays*. *See* 871 F.3d at 447. As in *Bennett*, the PBMs face constant, pervasive, and "direct[] supervision" from the federal government. 607 F.3d at 1087. Not so in *Mays*. *See* 871 F.3d at 446. As in *Bennett*, the government could set binding standards for the

Case: 24-3033   Document: 75-2   Filed: 01/27/2026   Page: 7

No. 24-3033          *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*          Page 7

contractors' employees, 607 F.3d at 1087, as today's contracts require the PBMs to meet safety, turnaround, dispensing, and drug interchange standards of OPM's choosing.  Not so, or at least not mentioned, in *Mays*.  And as in *Bennett*, the PBMs perform a task the federal government would have to perform.  607 F.3d at 1088.  Not so in *Mays*.  *See* 871 F.3d at 446 (noting that the Michigan agency, MDEQ, ultimately enforced Michigan law).

Ohio's responses on this score do not persuade us otherwise.  The State argues that its complaint challenges only the PBMs' conduct with respect to non-federal clients.  Because the federal government has no duty to those clients, Ohio reasons, the PBMs did not "act under" a federal officer during the relevant negotiations.  But when the PBMs bargain with drug manufacturers and pharmacies, they conduct a single negotiation on behalf of all of their clients.  Alleged liability arising from this negotiation process necessarily includes federal conduct.

Confirming this conclusion is the reality that Ohio's complaint seeks backward-looking relief through money damages.  Whether the PBMs *could* conduct separate negotiations in the future does not matter.  *Cf. Davis v. South Carolina*, 107 U.S. (17 Otto) 597, 600 (1883) ("Davis *was acting* in [a federal] capacity." (emphasis added)).  What matters is that the targeted negotiations were handled holistically and that, as a result, the complaint necessarily targets federal conduct.  As Ohio conceded at oral argument, two other circuits and a concurrence by Judge Ikuta have come to the same conclusion in this precise scenario, and no circuits have gone the other way. *See Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 191 (1st Cir. 2024); *West Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 199 (4th Cir. 2025); *see also California v. CaremarkPCS Health LLC*, 2024 WL 3770326, at *2 (9th Cir. 2024) (Ikuta, J., concurring only in the judgment) ("In targeting Caremark's rebate negotiations for private clients, California necessarily also targets Caremark's rebate negotiations for the federal government (since they are the same negotiations).").

Ohio separately relies on *Graves v. 3M Co.*, 17 F.4th 764 (8th Cir. 2021), but it does not lead to a contrary conclusion.  Plaintiffs sued 3M for allegedly failing to warn them that the earplugs it manufactured could fail if users did not follow the relevant fitting instructions.  *Id.* at 768.  Because 3M manufactured the devices in consultation with the Army, it invoked the officer-removal statute.  *Id.*  The Eighth Circuit rejected 3M's removal request.  *Id.* at 767.  Even though

Case: 24-3033     Document: 75-2     Filed: 01/27/2026     Page: 8

No. 24-3033          *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*          Page 8

3M worked with the Army in designing the earplugs, the Eighth Circuit reasoned that it had not done so with respect to the instructions and warnings it attached to commercial sales. *Id.* at 770. Ohio's complaint, if anything, parallels the kind of design-defect claims that the Eighth Circuit would have likely allowed to be removed in *Graves* (if the plaintiff had brought such claims). *See* 17 F.4th at 770.

Neither does *Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.* advance Ohio's position. 647 F. App'x 619, 623–24 (6th Cir. 2016). It held that Medicare Advantage Organizations, which provide a privatized alternative to Medicare Parts A and B, do not perform a task that the government would otherwise have to perform. The removing parties in *Humana* existed solely to provide a private competitor to traditional Medicare. 647 F. App'x at 623–24. If they left the stage, as *Humana* explained, the federal government could simply scrap the private alternative. *Id.* Negotiating drug prices, by contrast, is a yearly, fundamental, and never-ending feature of a statutory obligation that the federal government owes to its employees. *See Coventry Health*, 581 U.S. at 91; 5 U.S.C. § 8901. There is no scrapping that, as *Humana* appreciated. *See* 647 F. App'x at 624 (describing "providing health care to federal employees" as a "task[] that the government would otherwise have to use its own agents to complete").

*Humana* and *Graves* showcase complaints that properly avoid federally controlled conduct. The plaintiffs in *Graves* limited their lawsuit to 3M's alleged failure to warn them about the proper use of the earplugs it manufactured. 17 F.4th at 770. By confining liability to commercial warnings (which had nothing to do with "carrying out or assisting in the *government's* duties") the plaintiffs challenged 3M's alleged wrongdoing while leaving its federal conduct untouched. *Id.* The plaintiffs in *Humana* likewise targeted a Medicare Advantage Organization's alleged unjust enrichment in a purely "private billing dispute." 647 F. App'x at 620, 625. The challenged conduct thus occurred at "a distance from" the federal Centers for Medicare and Medicaid Services. *Id.* at 624. Perhaps Ohio could carve out federal activity in a future complaint with respect to prescription-drug prices. But it has not done so here.

Ohio insists that its complaint challenges only the unlawful retention of rebates, not the inflation of list prices in the negotiation process, and thus its complaint does not reach federal conduct for that reason. Because the complaint extends to price increases that (at least on this

Case: 24-3033   Document: 75-2   Filed: 01/27/2026   Page: 9

No. 24-3033          *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*          Page 9

record) do not arise solely from retention of rebates, we disagree. Three consecutive paragraphs at a minimum belie Ohio's theory. One: "During its negotiations with Manufacturers, Express Scripts threatens to deny favorable Formulary tier position to . . . any drug on which the Manufacturer will not pay the demanded level of fees and Rebates." R.1-3 ¶ 80. Two: "[T]he only way that Manufacturers can satisfy Express Scripts' demand for higher Rebates is to raise List Prices." R.1-3 ¶ 81. Three: "The higher List Prices that Express Scripts extracts from Manufacturers in exchange for Formulary placement raise out-of-pocket costs." R.1-3 ¶ 82. Still more paragraphs repeat and reemphasize this theme. *See, e.g.*, R.1-3 ¶¶ 3, 10, 14–17, 20, 29, 60, 72, 77, 80–84, 88–109, 144, 177, 196–97, 209–11. The focus on the PBMs' overall negotiations, for example, arises in the third paragraph. R.1-3 ¶ 2 (charging the PBMs with orchestrating a "'pay to play' rebate system that, perversely, pushes manufacturers to *increase* drug prices"). Then, on the third to last page of the complaint's narrative, Ohio continues to drive the same point home. R.1-3 ¶ 194 ("[The PBMs] carry[] out agreements with Manufacturers that have the purpose and effect of fixing and increasing the out-of-pocket prices these individuals must pay for their prescription drugs."). And, contrary to the State's suggestions, the complaint does not discuss price hikes merely to build atmosphere; Ohio premises its causes of action on the same alleged harm. *See* R.1-3 ¶ 209 ("Ohio purchasers of drugs . . . have been injured because of the supracompetitive prices of drugs set by this combination."). Nowhere does Ohio allege that these harmful price increases arise solely from the retention of rebates. On this record, it follows that, when Ohio challenges the PBMs' effect on drug prices, it unavoidably also challenges their negotiations with manufacturers and necessarily reaches federally controlled conduct. *See Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020) ("[I]t is still enough for the present purposes of removal that at least some of the pollution arose from the federal acts."); *California*, 2024 WL 3770326, at *2 (Ikuta, J., concurring only in the judgment).

Ohio separately disclaims any intent to impose liability based on the administration of FEHB or TRICARE. When federal jurisdiction turns on the types of claims that a plaintiff asserts against a defendant, sure enough, the plaintiff may disclaim seeking certain kinds of liability to avoid federal jurisdiction. *See Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 407–08 (6th Cir. 2007). But not all disclaimers do the trick. We reject disclaimers that simply disavow any attempt to recover based on the defendant's indivisible federal conduct, as several other

Case: 24-3033     Document: 75-2     Filed: 01/27/2026     Page: 10

No. 24-3033          *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*          Page 10

circuits have concluded. *See Puerto Rico*, 119 F.4th at 191; *Hunt*, 140 F.4th at 195–96; *California*, 2024 WL 3770326, at *2 (Ikuta J., concurring only in the judgment).

The reason respects the statute's text and text-driven purpose. When the applicability of the disclaimer turns on whether the defendant's actions are in fact related to conduct undertaken under color of federal office, a remand would mean denying the defendant a chance to present his federal defenses in federal court. *See Willingham v. Morgan*, 395 U.S. 402, 408–09 (1969). Think about *Tennessee v. Davis*, in which the State indicted a federal revenue agent in state court and the officer attempted to remove the case. 100 U.S. (10 Otto) at 272. Tennessee could not have reestablished jurisdiction merely by filing a document to the effect that "we do not seek to punish Davis for conduct undertaken under color of his office as deputy collector of internal revenue." Else, the officer removal statute would not have provided any protection at all. *See Davis*, 100 U.S. (10 Otto) at 272.

Ohio's disclaimer runs into this principle. In its motion to remand, Ohio "expressly stat[ed]" that it "does not seek recovery for the types of PBM or pharmacy services Removing Defendants identify in their notice of removal as they relate to TRICARE or FEHB plans." R.40 at 10. Relinquishing claims "as they relate to" TRICARE or FEHB would allow a state court to decide whether the federal government directed the conduct at issue. *See, e.g.*, *California*, 2024 WL 3770326, at *1. Compounding the problem, the defendants' theory of the case centers on the indivisibility of their work for private and federal clients and turns on conduct—negotiations— that have already occurred. *See Hunt*, 140 F.4th at 199. Crediting that theory requires us to reject Ohio's disclaimer.

In this respect, *Jefferson County v. Acker* provides another reason to accept the PBMs' indivisibility argument. 527 U.S. 423 (1999). *Acker* reasoned that federal courts should accept the defendant's "theory of the case" for jurisdictional purposes. *Id*. at 432–33. We have ample company in applying that principle to indivisible drug-price negotiations that have already occurred. *See Puerto Rico*, 119 F.4th at 189; *Hunt*, 140 F.4th at 199; *California*, 2024 WL 3770326, at *2 (Ikuta, J., concurring only in the judgment) ("Under this theory of the case, which we must credit, if Caremark were liable for negotiating rebates on behalf of private clients, it would necessarily also be liable for negotiating rebates on behalf of the federal government.").

Case: 24-3033     Document: 75-2     Filed: 01/27/2026     Page: 11

No. 24-3033          *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*          Page 11

Nor does this approach overread *Acker*. The State claims that *Acker*'s discussion of crediting the "theory of the case" refers only to accepting the defendant's legal theories and not to crediting factual conclusions. We agree but the distinction does not help the State. In *Acker*, federal judges attempted to remove a state-law lawsuit that, in their opinion, attempted to collect an unconstitutional tax. 527 U.S. at 427; *see McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 327 (1819). The Solicitor General of the United States and the judges disagreed as to whether the local tax fell on the judges for their work as judges or on them personally. *Acker*, 527 U.S. at 432. For jurisdictional purposes, the Court credited the judges' legal model as to what was being taxed. *Id.* The "theory" we credit today is similar. The parties disagree about whether the liability imposed on the negotiation process necessarily falls on federal conduct arising from a single negotiation for drug prices, and we accept for jurisdictional purposes that it does. *See Hunt*, 140 F.4th at 199 ("Caremark's theory of the case is that West Virginia attempts to hold them liable for a single negotiation that was undertaken for all its clients."); *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 507 (D.C. Cir. 2020) (applying *Acker* to credit a defendant's legal model of where a common-law claim places liability).

*For or relating to any act under federal office.* The complaint also challenges conduct "for or relating to" an "act under color of [federal] office." 28 U.S.C. § 1442(a)(1). The 2011 Removal Clarification Act amended § 1442 and expanded its scope by adding the words "or relating to." We interpret the phrase "relates to" as meaning "[c]onnected in some way." Black's Law Dictionary 1158 (5th ed. 1979). Identical language appears in the Employee Retirement Income Security Act of 1974 and the Airline Deregulation Act of 1978. In those contexts, "[t]he ordinary meaning of these words is a broad one," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992), as the phrase is "conspicuous for its breadth," *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990). Even before the 2011 Act, we had said that "it is enough that the federal officer's acts or presence at the place in performance of his official duty constitutes the basis" for the lawsuit. *Bennett*, 607 F.3d at 1088 (quotation omitted). As amended, the statute requires only an association, connection, or tie between the challenged conduct and the defendant's acts under color of federal office. *See, e.g.*, *Willingham*, 395 U.S. at 408–09; *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017); *Baker*, 962 F.3d at 944 (collecting cases).

Ohio alleges liability for conduct relating to an act under color of federal office. 28 U.S.C. § 1442(a). The PBMs, to begin and to repeat, maximize their leverage by deliberately conducting a single negotiation on behalf of all of their clients. Dividing the negotiations into federal and non-federal components, the PBMs argue, might have the reverse effect. They say it might empower drug companies and pharmacies, it might raise prices, and it might reduce rebates. The complaint targets both the substance of the negotiations and the rebate-distribution process that follows it. The conduct that Ohio wishes to regulate thus has a straightforward "connection or association" with the work that the PBMs perform for the carriers and the Office of Personnel Management to further the agency's FEHBA duties. *Sawyer*, 860 F.3d at 258; *see Morales*, 504 U.S. at 384; *Willingham*, 395 U.S. at 408. Every circuit to look at similar negotiations has reached the same conclusion. *Puerto Rico*, 119 F.4th at 190; *Hunt*, 140 F.4th at 199; *see California*, 2024 WL 3770326, at *2 (Ikuta, J., concurring only in the judgment).

Ohio offers several responses, all unconvincing. It points out that the Office of Personnel Management prohibits the PBMs from retaining the rebates they extract from manufacturers. Because Ohio's complaint challenges conduct that would independently violate the PBMs' obligations to the federal government, Ohio argues that the acts at issue could not have occurred "under color of [federal] office." 28 U.S.C. § 1442(a)(1). But defendants sued for alleged conduct contrary to the terms of a federal office still may satisfy the "under color of" prong. *See Arizona v. Manypenny*, 451 U.S. 232, 234 (1981). The statute demands a sufficient relation "between the charged conduct and asserted official authority." *Willingham*, 395 U.S. at 409. Nowhere does it require that the charged conduct itself constitute a lawful exercise of the defendant's federal powers. *Id.*; *cf. United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011) ("A person acts under color of federal law in respect to a cause of action by claiming or wielding federal authority.").

Precedent confirms as much. The tax collector on trial in *Tennessee v. Davis* did not have discretion to commit murder. *See* 100 U.S. (10 Otto) at 260. And it is doubtful that the medical official in *Willingham* enjoyed contractual or legal authority to inject the plaintiff "with a deleterious foreign substance" or to "assault[], beat[], and torture[] him in various ways." 395 U.S. at 409 (quotation omitted). Even under older and narrower versions of the officer-removal

Case: 24-3033     Document: 75-2     Filed: 01/27/2026     Page: 13

No. 24-3033     *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*     Page 13

statute, these cases could remain in federal court. *Davis*, 100 U.S. (10 Otto) at 272; *Willingham*, 395 U.S. at 404. Section 1442 gives the defendant a chance to prove in federal court that it lawfully carried out its federal duties. *Acker*, 527 U.S. at 433. Conditioning removal on a showing of federal authorization would force the officer to "win his case before he can have it removed." *Willingham*, 395 U.S. at 407.

Ohio protests that an unduly literal reading of the key phrase would imply nearly every complaint alleges liability for acts "relating to" federal conduct. True enough, reading "'relate to' provision[s]" without limitation runs the risk of "pick[ing] up every ripple in the pond, producing a result that no sensible person could have intended." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 152–53 (2001) (Scalia, J., concurring) (quotation omitted). But the same commonsense principles that limit the phrase in the ERISA and Airline Deregulation Act contexts limit it here. Conduct with only a "tenuous, remote, or peripheral" relationship to federal activity does not "relate to" it. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983). And just as we "consider[] ERISA's objectives as a guide to the scope of" preemption, *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (quotation omitted), the text-driven purpose of § 1442 informs the scope of removal. Ohio's complaint targets the PBMs' negotiations on behalf of federal clients, and that conduct bears a far more than "peripheral" relationship to acts under color of federal office. *Morales*, 504 U.S. at 390.

Ohio claims that its complaint does not cover federally directed conduct. Before the 2011 amendment to the statute, it is true, the statute referred only to lawsuits "for any act under color of [federal] office." 28 U.S.C. § 1442(a) (2010). And we interpreted that text, it is also true, to require a defendant to point to "acts it performed at the direction of the federal officer." *Bennett*, 607 F.3d at 1088. But Congress has expanded § 1442 since then, adding the italicized language: "for *or relating to* any act under color of such office." Conduct thus can "relate to" acts under color of a federal office without having been federally directed. *See Sawyer*, 860 F.3d at 258. So, yes, Ohio is right that the Office of Personnel Management prohibits retention of negotiated rebates. But, no, Ohio is wrong that any such misconduct lacks an adequate connection to the negotiations that the PBMs conduct on behalf of the government.

Case: 24-3033   Document: 75-2   Filed: 01/27/2026   Page: 14

No. 24-3033          *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*          Page 14

*Colorable federal defense.* The PBMs also possess colorable federal defenses. A key premise of § 1442 is to permit federal defenses to be tried in federal court. *Mesa v. California*, 489 U.S. 121, 137 (1989). For that reason, defendants need only articulate a colorable federal defense, not a "clearly sustainable" one. *Willingham*, 395 U.S. at 407; *see City of Nashville v. Cooper*, 73 U.S. (6 Wall.) 247, 254 (1867) ("[The ultimate] validity of the defence authorized . . . has no connection whatever with the question of jurisdiction.").

The PBMs present a pair of plausible federal-preemption defenses. Any FEHB plan contract's terms that "relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans." 5 U.S.C. § 8902(m)(1). When it last interpreted this preemption provision, the Supreme Court repeated the obvious—"that the phrase 'relate to' in a preemption clause expresses a broad pre-emptive purpose." *Coventry Health*, 581 U.S. at 96 (quotation omitted). Ohio's complaint states that the PBMs "contract with commercial health insurers" to "negotiat[e] . . . drug prices, discounts, and other terms of sale with Manufacturers on [plan sponsors'] behalf." R.1-3 ¶ 49. Negotiating the prices of the plan's prescription drugs colorably "has a connection with," *Egelhoff*, 532 U.S. at 147 (quotation omitted), the "provision[] or extent of coverage or benefits," 5 U.S.C. § 8902(m)(1), because the drugs are a benefit. And laws imposing liability on the PBMs for how they negotiate the prices of the drugs that the plan will cover colorably "ha[ve] a connection with," *Egelhoff*, 532 U.S. at 147 (quotation omitted), the plans themselves, *Puerto Rico*, 119 F.4th at 190.

The same is true for the PBMs' TRICARE preemption defense. "A law or regulation of a State or local government relating to health insurance, prepaid health plans, or other health care delivery or financing methods shall not apply to any contract entered into pursuant to [TRICARE] by the Secretary of Defense." 10 U.S.C. § 1103(a). This broad preemptive language likewise colorably provides the PBMs with a defense against state-law liability in this context. *See Arlington Cnty.*, 996 F.3d at 253. Every circuit to address the issue has reached the same conclusion with respect to FEHB and TRICARE. *See, e.g.*, *id.*; *Puerto Rico*, 119 F.4th at 190; *Hunt*, 140 F.4th at 198–99.

Case: 24-3033     Document: 75-2     Filed: 01/27/2026     Page: 15

No. 24-3033          *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*          Page 15

Ohio's contrary arguments fail. Ohio suggests that FEHBA does not preempt state laws of general application. But, in the context of ERISA, the Supreme Court reasoned that such an argument would create an "irrational loophole" and at any rate "ignores the sweep of the 'relating to' language." *Morales*, 504 U.S. at 386. We think it colorable that Ohio's mirror-image theory has the same pitfall. *See Pilot Life Ins. Co v. Dedeaux*, 481 U.S. 41, 47 (1987) (ERISA).

Noting that FEHBA's preemption provision refers to "law[s]" and "regulation[s]," Ohio contends that the statute does not preempt its common law claims under *Sprietsma v. Mercury Marine*, 537 U.S. 51, 52 (2002). And Ohio's antitrust statute, the State adds, merely codifies the common law and thus should fall within the same exception. The analogy does not hold. In *Sprietsma*, the Court interpreted the Federal Boat Safety Act of 1971, 46 U.S.C. §§ 4301–11. It viewed the Boat Act's reference to "*a* law or regulation" as "impl[ying] a discreteness . . . that is not present in the common law." *Sprietsma*, 537 U.S. at 63 (emphasis added). FEHBA, by contrast, refers to "*any* State or local law." 5 U.S.C. § 8902(m)(1). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). *Sprietsma*, it bears adding, explained that the Boat Act's savings clause presumes that common-law liability persists in that area. 537 U.S. at 63. Ohio does not point to such provision in FEHBA.

Last and least, Ohio claims that the PBMs' TRICARE preemption argument fails because the statute's preemption provision applies only "to the extent that [the Secretary of Defense or administering secretaries] determine that . . . the preemption of the state law is necessary to administer [TRICARE]." 10 U.S.C. § 1103(a). Ohio appears to think that the Secretary has not made the necessary determination. But he has. 32 C.F.R. § 199.17(a)(7)(i)(ii).

*Jurisdictional discovery.* If all else fails, Ohio requests jurisdictional discovery in the district court. But the State never moved for any such discovery below. Even now, Ohio bases its request on evidence that Express Scripts negotiates on behalf of its commercial clients using a third-party organization. That reality, however, does not undercut the PBMs' consistent claim that the conduct Ohio challenges flows from an integrated system that draws on negotiation on behalf of all of their clients, federal and commercial alike. Because we view the divisibility issue as

Case: 24-3033   Document: 75-2   Filed: 01/27/2026   Page: 16

No. 24-3033            *Ohio ex rel. Yost v. Ascent Health Servs., LLC, et al.*            Page 16

principally a question of legal theory rather than historical fact at all events, discovery would bring no value to the issue.  *See Acker*, 527 U.S. at 427.  We reject the request.

We reverse and remand.