April 29, 2026

**VIA CM/ECF**

David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

   Re: *Town of Pine Hill, Alabama v. 3M Company*, No. 25-10746

Dear Mr. Smith:

  3M submits this letter brief regarding *Chevron USA Inc. v. Plaquemines Parish*, No. 24-813 (U.S. Apr. 17, 2026) ("Op."). *Chevron* clarifies the governing law in favor of defendants seeking removal and underscores the need for reversal here.

  In *Chevron*, a local government sued in state court for environmental damage, alleging that Chevron failed to obtain necessary permits under a law that "took effect in 1980" and exempts activities "legally commenced" before that year. Op.4-5. Chevron removed under 28 U.S.C. §1442(a), alleging that plaintiffs' expert report revealed that the case implicated activities undertaken pursuant to federal direction during World War II ("WWII"). Notably, the plaintiffs "limit[ed] the scope of th[eir] claims" in hopes of avoiding federal jurisdiction, expressly disclaiming any "claims … preempted by federal law." Complaint at 16, *Plaquemines Parish v. Total Petrochemicals & Refining USA, Inc.*, No. 2:18-cv-05256 (E.D. La. May 23, 2018), Dkt.1-8. A divided Fifth Circuit panel rejected Chevron's removal effort, but the Supreme Court unanimously reversed.

  *Chevron* supports 3M's position in multiple respects. First, the Supreme Court expressly rejected the legal standard for relatedness on which the Town relies. Both the Town and the district court invoked a "causal nexus requirement," claiming that defendants "must 'demonstrate that the acts for which they are being sued … occurred *because of* what they were asked to do by the Government.'" Town.Br.15 (citing *Georgia v. Meadows*, 88 F.4th 1331, 1343 (11th Cir. 2023)); *accord* D.Ct.Dkt.81 at 6-7 (same). Indeed, the Town attempted to distinguish *Maine v. 3M Co.*, 159 F.4th 129 (1st Cir. 2025), on ground that the First Circuit applies a lower nexus standard. Dkt.43 at 1-2. But the Supreme Court squarely rejected a causal nexus test: While §1442(a) previously required a "causal connection between the charged conduct and asserted official authority," Congress "broadened the statute" in 2011 to require only "some relation" between the two—i.e., "a connection that is not 'tenuous, remote, or peripheral.'" Op.7-8 & n.3. "Accordingly, a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." Op.7-8.

Second, *Chevron* reaffirms that courts must "credit plausible factual allegations by the removing party" in assessing whether the requisite connection exists. Op.9. That refutes the Town's assertion that 3M must "prove" each of §1442(a)'s requirements "by a preponderance of the evidence" at the removal stage. Town.Br.21.

Third, *Chevron* fatally undermines the Town's effort to artificially narrow the charged conduct by focusing on the gravamen of the complaint or disclaimers of preempted conduct. The Town emphasizes that its complaint alleges only PFAS contamination from "paper mills" and "never mention[s]" "3M's decades-old production of military-grade AFFF" at an upstream military base. Town.Br.1. But the plaintiffs in *Chevron* likewise insisted that their allegations "[we]re strictly limited" to Chevron's post-1980 permitting violations; their complaint never mentioned Chevron's WWII-era work for the U.S. military. Brief for Parish of Plaquemines at 14, No. 24-813 (U.S. Nov. 13, 2025). Indeed, removal in *Chevron* was based on an expert report filed years after the operative complaint. The Supreme Court nevertheless eschewed any focus on the gravamen of the complaint and concluded that the suit "implicates Chevron's wartime production of crude oil" based on *Chevron's theory* in its removal papers that the production was legally commenced before 1980. Op.7. Similarly, the focus here should be on 3M's theory of removal and 3M's plausible allegations that MilSpec AFFF PFAS has indistinguishably commingled with other PFAS in the Town's water supply. 3M.Br.24-31.

Finally, *Chevon* confirms that 3M need not show it is "*currently* 'acting under' a federal officer." *Contra* Town.Br.14-15. Consistent with myriad precedents, *see* Reply.Br.4-6, the Supreme Court permitted removal based on Chevron's *past* actions under federal officials at a temporary wartime agency, even though both the agency and the responsible officials have long since left the scene. Op.9-10. The unfairness of forcing those who acted under federal officials to defend their actions in state court does not depend on whether those officers remain on the federal payroll.

Just like *Chevron*, "[t]his suit implicates acts by [the defendant] that are closely connected to [its] performance of" a contract to produce a specialized product for the U.S. military. Op.10. Just like *Chevron*, this case belongs in federal court.

Sincerely,

s/Paul D. Clement
Paul D. Clement

*Counsel for Defendants-Appellants*

Cc: All Counsel of Record

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHEVRON USA INC. ET AL. *v.* PLAQUEMINES PARISH, LOUISIANA, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 24–813. Argued January 12, 2026—Decided April 17, 2026

The federal officer removal statute, 28 U. S. C. §1442(a)(1), authorizes removal of state-court suits against federal officers or persons "acting under" them "for or relating to any act under color of such office." This case concerns whether, for purposes of the statute, a state-court environmental suit challenging Chevron's crude-oil production during the Second World War is "for or relating to" Chevron's wartime refining of crude oil into aviation gasoline for the U. S. military.

   In 1978, Louisiana enacted the State and Local Coastal Resources Management Act, which prohibited certain uses of Louisiana's coastal zone, including oil production, without a permit. The Act exempted uses legally commenced before 1980. In 2013, Plaquemines Parish and other parishes filed 42 state-court suits against oil and gas companies under the Act. They alleged that the companies lacked permits and that some uses, although initiated before 1980, were illegally commenced and therefore not covered by the exemption. An expert report filed by the parish made clear that it intended to challenge certain defendants' crude-oil production during the Second World War. The report alleged that Chevron failed to use steel tanks instead of earthen pits, should not have used vertical-drilling methods, and failed to equip fields with sufficient roads, using canals instead.

   Chevron removed the suit to federal court under the federal officer removal statute, arguing that the suit "relat[ed] to" its contractual duties to refine crude oil into avgas for the military during the war. The District Court rejected this argument and granted the parish's motion to remand to state court. The Fifth Circuit affirmed, agreeing that Chevron had "acted under" a federal officer as a military contractor

but concluding that the suit was not "for or relating to" those acts because Chevron's refining contract did not specify how to acquire crude oil. Judge Oldham dissented, reasoning that crude oil was "indispensable" to avgas, such that its production necessarily related to Chevron's performance of its federal avgas refining duties.

*Held*: Chevron has plausibly alleged a close relationship between its challenged crude-oil production and the performance of its federal avgas refining duties—not a tenuous, remote, or peripheral one—and has therefore satisfied the "relating to" requirement of the federal officer removal statute. Pp. 7–12.

    (a) The phrase "relating to" sweeps broadly, meaning "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 383. One thing can relate to another even if the connection is "indirect," *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 139; even if it was "not specifically designed to affect" it, *ibid.*; and even without a "strict causal relationship," *Ford Motor Co.* v. *Montana Eighth Judicial Dist. Court*, 592 U. S. 351, 362. Accordingly, a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct.

    The ordinary meaning of "relating to," however, is not "so broad that it is meaningless." *Rutledge* v. *Pharmaceutical Care Management Assn.*, 592 U. S. 80, 93 (THOMAS, J., concurring). The ordinary meaning requires a connection that is not "'tenuous, remote, or peripheral.'" *Id.*, at 94. Ordinary readers would not understand the federal officer removal statute to reach all suits with any attenuated connection to federal duties. Pp. 7–9.

    (b) Chevron's suit "relat[es] to" the performance of federal duties because Chevron has plausibly alleged a close relationship between its challenged conduct and the performance of its federal duties. This suit implicates Chevron's wartime efforts to produce and supply avgas' essential feedstock, so it is closely connected to Chevron's wartime avgas refining for the military. Much of the crude oil that Chevron produced in Plaquemines Parish was ultimately used for its own avgas refining, and the suit challenges Chevron's actions that allowed it to increase its production of crude oil during wartime. The parish's report alleged that Chevron's use of the coastal zone had been illegally commenced because of its reliance on vertical-drilling methods, canals, and earthen pits—but using vertical-drilling methods maximized crude-oil production; using canals saved time and materials resulting in more timely oil production; and using earthen pits complied with the Government's directive to preserve steel. The Government emphasized the importance of increasing Chevron's crude-oil production to support avgas refining as part of the war effort, and it identified the oil field at

issue as critical to the war program because it produced a preferential kind of crude oil for refining avgas. In this all-hands-on-deck, wartime context, Chevron needed to produce more crude oil as quickly as possible to facilitate more avgas refining, including its own. Pp. 9–10.

(c) The Court disagrees with the Fifth Circuit's two main reasons for ruling to the contrary. First, the Fifth Circuit reasoned that Chevron's refining contract did not specify *how* to obtain or produce crude oil, so Chevron's crude-oil production was unrelated to the performance of its federal refining duties. But the ordinary meaning of "relating to" does not require the defendant to show that his federal duties specifically invited his challenged conduct; Chevron's contract did not have to expressly direct or invite Chevron's crude-oil production for that conduct to "relate to" its avgas refining. Second, the Fifth Circuit reasoned that the Government's allocation of crude oil to refineries severed any relation between producing and refining. But an act can relate to its consequences even when the causal chain includes actions by intermediaries, see *Morales*, 504 U. S. 374; producing crude oil relates to refining it into avgas, even if the Government acted as an intermediary allocating the crude oil to refineries. Pp. 10–11.

(d) The Court also disagrees with Louisiana's argument that the removal statute requires that the defendant was "acting under" a federal officer in taking the specific actions challenged in the suit. This theory is not consistent with the statutory text, which permits removal of suits against officers or their agents for acts that were not done under color of their offices, so long as the suits "relat[e] to" such acts. Louisiana's interpretation would leave the "relating to" requirement with little, if any, independent function, impermissibly conflating the "acting under" and "for or relating to" elements of the federal officer removal test. Pp. 11–12.

103 F. 4th 324, vacated and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. JACKSON, J., filed an opinion concurring in the judgment. ALITO, J., took no part in the decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 24–813

## CHEVRON USA INCORPORATED, ET AL., PETITIONERS *v.* PLAQUEMINES PARISH, LOUISIANA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 17, 2026]

JUSTICE THOMAS delivered the opinion of the Court.

Congress has long authorized federal officers and their agents to remove suits brought against them in state court to federal court. The federal officer removal statute authorizes an officer or "person acting under that officer" to remove state suits "for or relating to any act under color of such office." 28 U. S. C. §1442(a)(1). In this case, Chevron USA Inc. invoked the statute to remove to federal court an environmental suit brought against it in Louisiana state court. Chevron argued that the suit was removable because it implicates Chevron's crude-oil production during the Second World War, when Chevron also refined crude oil into aviation gasoline for the U. S. military. No party disputes that Chevron "act[ed] under" federal officers when it performed its refining duties. We thus decide only whether this suit, which implicates Chevron's wartime production of crude oil, "relat[es] to" Chevron's wartime aviation-gasoline refining for the military. We hold that it does.

## I

### A

To protect the Federal Government from state-court "interference with its operations," Congress has given federal courts jurisdiction over some suits against federal officers or those acting under them. *Watson* v. *Philip Morris Cos.*, 551 U. S. 142, 150 (2007) (internal quotation marks omitted). The current federal officer removal statute traces its lineage to the Force Bill of 1833, which Congress passed to enable federal customs officials to remove suits to federal court after South Carolina began prosecuting them for enforcing federal law. See *Tennessee* v. *Davis*, 100 U. S. 257, 268–269 (1880); Brief for U. S. Sen. Mike Lee et al. as *Amici Curiae* 4. Over the next 200 years, Congress expanded the scope of federal officer removal beyond suits against customs officials. *Id.*, at 4–6. Today, defendants may remove to federal court any

> "civil action or criminal prosecution that is commenced in a State court and that is against or directed to . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U. S. C. §1442(a)(1).

Under the federal officer removal statute, a removing defendant must satisfy three requirements. First, the removing defendant must be the United States, a federal agency, a federal officer, or a person "acting under" a federal officer, such as certain private parties hired to assist federal officers. See *Watson*, 551 U. S., at 148–153. Second, the suit must be "for or relating to any act under color of such office." §1442(a)(1). Third, the removing defendant must assert "a colorable federal defense." *Mesa* v. *California*, 489 U. S. 121, 129 (1989); see *id.*, at 136–137 (grounding this requirement in Article III of the Constitution). This case concerns the second requirement.

### B

When the United States entered the Second World War, aviation gasoline—or "avgas"—became critical for the military. The war spurred "a race to gain mastery of the skies." A. Baime, The Arsenal of Democracy 133 (2014). Success in the air required high-octane avgas, a "superfuel" for combat aircraft that helped to produce "more speed, more power, [and] quicker take-off." J. Frey & H. Ide, A History of the Petroleum Administration for War, 1941–1945, p. 193 (1946) (P. A. W. History). Avgas refining therefore had to keep pace with the "astonishing expansion of aerial activity" during the war. *Ibid.* In June 1940, the U. S. military used about 4,000 barrels of avgas per day, while American industry could refine 30,000 to 40,000 barrels per day. *Id.*, at 194. By 1944, at the height of U. S. involvement in the war, the U. S. military needed 636,000 barrels per day. *Ibid.*

President Franklin D. Roosevelt created the Petroleum Administration for War (P. A. W.) to ensure that the United States would have enough fuel to win the war. See *id.*, at 14–15, 44–45. The P. A. W. oversaw the entire oil industry, from production to transportation to refinement. Within two weeks after the attack on Pearl Harbor, the P.A.W. issued a directive for "the production of 100 octane aviation gasoline [to] be greatly increased." 7 Fed. Reg. 41 (1942). The message was clear: "'[F]orget economic considerations—forget everything except getting out more and more 100-octane [avgas] as quickly as you can.'" P. A. W. History 199. With the P. A. W.'s assistance, the Federal Government, through the Defense Supplies Corporation, contracted with dozens of avgas refineries to secure avgas for the military.

The Government entered an avgas refining contract with a predecessor of Chevron, the Texas Company.[1] In its contract with the Government, Chevron agreed to work "day and night" to quadruple its avgas refining capacity at its Texas refinery. App. to Pet. for Cert. 150–151. It agreed that the Government could request that it buy avgas components, including crude oil, from other firms. And, it agreed that the Government could "at any time" purchase all of Chevron's excess avgas. *Id.*, at 156.

The Government knew that to refine crude oil into avgas, Chevron needed crude oil. The Government's contract with Chevron adjusted the price of avgas based on the cost of obtaining crude oil. The P. A. W. allocated crude oil to specific refiners to maximize output. And, the P. A. W. required production methods that increased crude-oil production, such as vertical drilling. 8 Fed. Reg. 3955, 3957 (1943).

At the same time, Chevron produced crude oil in Plaquemines Parish, Louisiana, including in two fields relevant to this case—the Delacroix Island and Delta Duck Club fields. Some of the crude oil produced in both fields went to the Texas refinery at which Chevron refined crude oil into avgas for the military during the war. In 1942, Chevron was refining 4,000 barrels of crude oil per day from fields in Plaquemines Parish.

C

In 1978, Louisiana enacted the State and Local Coastal Resources Management Act. La. Rev. Stat. Ann. §49:214.21 *et seq.* (West 2023). The Act established a new permitting program that took effect in 1980. It prohibits any "[u]ses of state concern" of Louisiana's coastal zone, including oil production, unless the user first obtains a permit. §§49:214.25(A)(1)(f), 49:214.30(A)(1). But, it exempts from

———————
[1] All agree that as Chevron's corporate predecessor, the Texas Company's acts were Chevron's acts for the purposes of this case. We thus refer to it as "Chevron."

its permitting requirement "[i]ndividual specific uses legally commenced or established prior to the effective date of the coastal use permit program." §49:214.34(C)(2).

In 2013, Plaquemines Parish, along with other parishes, filed 42 state-court suits against oil and gas companies under the Act. The parishes alleged that the companies lacked permits for their uses of the coastal zone, and that some of these uses, although initiated before 1980, were illegally commenced and not covered by the Act's exemption for uses that commenced before 1980. The State of Louisiana and its Department of Energy and Natural Resources intervened in support of the parishes.

Plaquemines Parish filed an expert report in one of these suits that made clear that it intended to challenge certain defendants' crude-oil production during the Second World War. The report alleged that several uses had been illegally commenced during the war, making them "violations which provide the basis for defendant liability." Preliminary Expert Report on Violations, No. 2:18–cv–5256 (ED La.), ECF Doc. 1–3, p. 4. As to Chevron, the report identified production activities in the Delacroix Island field, where Chevron began drilling in 1941. Specifically, the report alleged that Chevron failed to use steel tanks instead of earthen pits. It alleged that Chevron should not have used vertical-drilling methods, which allegedly harmed the environment more than alternative methods. And, it alleged that Chevron failed to equip Delacroix Island with sufficient roads for transportation and instead primarily used canals. The report alleged that these production activities showed "bad faith" and failed to protect the "marshland from contamination and excessive land losses," making Chevron subject to liability under the Act. ECF Doc. 1–5, p. 35. All agree at this stage that this report reflects the parishes' general theories of liability across the 42 suits.

Several defendants removed the suits against them under the federal officer removal statute. 28 U. S. C.

§1442(a)(1).  The removal effort focused on the connection between these 1940s allegations and the defendants' 1940s federal contracts.  Because the allegations concerned their 1940s crude-oil production, the defendants argued that the suits "relat[ed] to" their contractual duties to refine crude oil into avgas for the military at the same time.

In this case, the parish's suit challenged Chevron's conduct at the Delta Duck Club field, where Chevron drilled during the war.  Chevron removed on the theory that the suit alleged that Chevron illegally produced crude oil in the Delta Duck Club field, while it simultaneously served as an avgas refiner for the military.  The parish's state-court complaint, like its expert report in the parallel case, alleged that Chevron's use of the coastal zone had been illegally commenced prior to the effective date of the Act, citing its crude-oil production processes, use of earthen pits, and dredging of canals.  Chevron's notice of removal thus argued that the complaint, alongside the parishes' report, showed that the parish would target acts related to its performance of federal duties during the war.  The District Court rejected this argument and granted the parish's motion to remand to state court.

The Fifth Circuit affirmed.  The court agreed with Chevron that it had "acted under" a federal officer because it refined crude oil into avgas as a military contractor. *Plaquemines Parish* v. *BP America Production Co.*, 103 F. 4th 324, 334–335 (2024).  But, the Fifth Circuit concluded that the suit was not "for or relating to" those acts. It agreed that the complaint, when "read in conjunction with the [expert] report," targeted crude-oil production activities during the war.  *Id.*, at 337.  Nonetheless, it concluded that this suit, despite challenging Chevron's crude-oil production, did not relate to the performance of Chevron's avgas refining contract because the contract did not specify how to acquire crude oil.  *Id.*, at 340–341.

Judge Oldham dissented. He reasoned that crude oil was "indispensable" to avgas, such that its production necessarily related to Chevron's performance of its federal avgas refining duties. *Id.*, at 348.

We granted Chevron's petition for a writ of certiorari. 605 U. S. 1009 (2025).

## II

We address whether this suit, which implicates Chevron's wartime production of crude oil, is "for or relating to" Chevron's wartime refining of crude oil into avgas for the military.[2]  28 U. S. C. §1442(a)(1).  Chevron's wartime crude-oil production was closely connected to its wartime avgas refining, so the parish's suit challenging that crude-oil production relates to that refining.

## A

The phrase "relating to" sweeps broadly. It means "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). One thing can relate to another even if the connection is "indirect." *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 139 (1990). One thing can relate to another even if it was "not specifically designed to affect" it. *Ibid.* And, one thing can relate to another even without a "strict causal relationship." *Ford Motor Co.* v. *Montana Eighth Judicial Dist. Court*, 592 U. S. 351, 362 (2021); see also *Altria Group, Inc.* v. *Good*, 555 U. S. 70, 85–86 (2008). Accordingly, a removing defendant need not show that his federal duties

―――――――

[2] The Fifth Circuit held that Chevron satisfied the first requirement of the removal statute because it "act[ed] under" a federal officer when it refined crude oil into avgas for the military pursuant to a federal contract. No party disputes that Chevron acted under a federal officer in that capacity. We assume, without deciding, that it did.

specifically required or strictly caused the challenged con-
duct.[3]   See *District of Columbia* v. *Exxon Mobil Corp.*, 89
F. 4th 144, 155 (CADC 2023) (collecting cases).

The ordinary meaning of "relating to," however, is not "so
broad that it is meaningless." *Rutledge* v. *Pharmaceutical
Care Management Assn.*, 592 U. S. 80, 93 (2020) (THOMAS,
J., concurring).  To be sure, in a literalist sense, "everything
is related to everything else." *California Div. of Labor
Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*,
519 U. S. 316, 335 (1997) (Scalia, J., concurring).  But, gen-
erally in statutory interpretation, "it is the ordinary, not lit-
eralist, meaning that is the better one." *Rutledge*, 592 U. S.,
at 93 (THOMAS, J., concurring); see A. Scalia, A Matter of
Interpretation 24 (1997) ("the good textualist is not a liter-
alist").

The ordinary understanding of "relating to" requires a
connection that is not "tenuous, remote, or peripheral."
*Rutledge*, 592 U. S., at 94 (THOMAS, J., concurring) (internal
quotation marks omitted).  Ordinary readers would not un-
derstand the statement that someone is "'related to Joe'" to
refer to "a mutual tie to Adam and Eve." *Ibid.*  Nor would
they understand the fluttering of a butterfly's wings to "re-
late to" the next week's weather.[4]  And, in this context, they
would not understand the federal officer removal statute to
reach all suits with any attenuated connection to federal

––––––––––

[3] Congress only recently adopted the "relating to" statutory language.
Before 2011, the statute required that the suit be "for" an act under color
of office.  28 U. S. C. §1442(a)(1) (2006 ed.).  This Court had interpreted
that language to require the removing defendant to "show a nexus, a
'"causal connection" between the charged conduct and asserted official
authority.'" *Jefferson County* v. *Acker*, 527 U. S. 423, 431 (1999).  In
2011, Congress broadened the statute by authorizing removal of suits
"for or relating to" an act under color of office.  §2(b), 125 Stat. 545.

[4] Cf. E. Lorenz, Predictability: Does the Flap of a Butterfly's Wings in
Brazil Set Off a Tornado in Texas?, at the American Association for the
Advancement of Science (Dec. 29, 1972) (describing what is now known
as the butterfly effect).

duties. For instance, the D. C. Circuit has held that a false-advertising suit targeting an oil company's statements to consumers about the future effects of fossil fuels on climate change did not relate to its decades-earlier production for the Government. See *Exxon Mobil Corp.*, 89 F. 4th, at 156; see also *Minnesota* v. *American Petroleum Inst.*, 63 F. 4th 703, 715 (CA8 2023).

## B

Chevron's case fits comfortably within the ordinary meaning of a suit "relating to" the performance of federal duties. Chevron has plausibly alleged a close relationship between its challenged conduct and the performance of its federal duties—not a tenuous, remote, or peripheral one. Cf. *Dart Cherokee Basin Operating Co.* v. *Owens*, 574 U. S. 81, 89 (2014) (explaining that, when reviewing a remand to state court, we credit plausible factual allegations by the removing party).

This suit implicates Chevron's wartime efforts to produce and supply avgas' essential feedstock, so it is closely connected to Chevron's wartime avgas refining for the military. Much of the crude oil that Chevron produced in the Delta Duck Club field was ultimately used for its own avgas refining. And, as the Fifth Circuit assumed and no party disputes, this suit will challenge Chevron's actions that allowed it to increase its production of crude oil in the Delta Duck Club field during wartime. See 103 F. 4th, at 337. The parish's report alleged that Chevron's use of the coastal zone had been illegally commenced because of its reliance on vertical-drilling methods, canals, and earthen pits. See *ibid.* But, using vertical-drilling methods "maximize[d] production" of crude oil. App. 19. Using canals instead of building roads saved "time, materials, and manpower," resulting in more "timely oil production." *Id.*, at 18. And, using earthen pits complied with the P. A. W.'s directive to preserve steel. See *id.*, at 22; 6 Fed. Reg. 5880 (1941). If

Chevron had refrained from these actions and produced less crude oil as a result, its avgas refining for the military may have suffered.

Moreover, the Government emphasized the importance of increasing Chevron's crude-oil production to support avgas refining as part of the war effort. The P. A. W. identified Delta Duck Club as a "'Critical Fiel[d] Essential to the War Program'" because it produced a "'preferential'" kind of crude oil for refining avgas. App. 112–113. Under Chevron's refining contract, the Government paid more for avgas when the price of obtaining crude oil increased. Meanwhile, the P. A. W. required the development of plans "to increase to a maximum the production of all grades of aviation gasoline . . . in the shortest possible time," including by addressing the need for components such as crude oil. 6 Fed. Reg. 6433–6434. And, the P. A. W.'s regulations required the vertical-drilling methods challenged by the parish as part of its effort to "provide adequate supplies of petroleum for military and other essential purposes." 8 Fed. Reg. 3955; see *id.*, at 3957. In this all-hands-on-deck, wartime context, Chevron needed to produce more crude oil as quickly as possible to facilitate more avgas refining, including its own.

Chevron has therefore satisfied the "relating to" requirement. This suit implicates acts by Chevron that are closely connected to the performance of its federal duties.[5]

C

We disagree with the Fifth Circuit's two main reasons for ruling to the contrary.

First, the Fifth Circuit reasoned that Chevron's refining contract did not specify *how* to obtain or produce crude oil, so Chevron's crude-oil production was unrelated to the

————————

[5] We do not resolve whether the defendants in the related cases can satisfy the "for or relating to" requirement. We also do not address the other requirements of federal officer removal.

performance of its federal refining duties. 103 F. 4th, at 341. But, the ordinary meaning of "relating to" does not require the defendant to show that his federal duties specifically invited his challenged conduct. See, *supra*, at 7–8. For example, we have held in the preemption context that a state law can "relate to" benefit plans even when the law was "not specifically designed to affect such plans." *Ingersoll-Rand*, 498 U. S., at 139. Likewise, Chevron's contract did not have to expressly direct or invite Chevron's crude-oil production for that conduct to "relate to" its avgas refining.

Second, the Fifth Circuit reasoned that the P. A. W.'s allocation of crude oil to refineries severed any relation between producing and refining. 103 F. 4th, at 344. But, as this Court's decision in *Morales* illustrates, an act can relate to its consequences even when the causal chain includes actions by intermediaries. *Morales* concerned whether state rules for advertising "'relat[ed]'" to airline "'rates'" and were therefore preempted by a federal statute. 504 U. S., at 378–379. This Court explained that if States restrict advertising, the market puts less pressure on airlines to "price competitively." *Id.*, at 388 (internal quotation marks omitted). Thus, advertising rules related to rates, even though advertising affects rates only through the acts of an intermediary, the consumer. *Id.*, at 389. Likewise, producing crude oil relates to refining it into avgas, even if the P. A. W. acted as an intermediary allocating the crude oil to refineries.

## D

Finally, we disagree with Louisiana's argument that it should prevail on an alternative theory. On Louisiana's view, this case should not turn on the meaning of "relating to" at all. Instead, Louisiana argues, the removal statute requires that the defendant was "acting under" a federal officer in taking the specific actions challenged in the suit.

Brief for Respondent State of Louisiana et al. 18, 21.  Louisiana does not dispute that Chevron acted under a federal officer while engaged in avgas refining.  But, because Chevron did not produce crude oil pursuant to a federal contract, Louisiana reasons that the suit is not against a defendant "acting under" an officer.

Louisiana's theory is not consistent with the statutory text.  The statute permits the removal of state-court suits against "any officer (or any person acting under that officer)" that are "for or relating to any act under color of such office."  28 U. S. C. §1442(a)(1).  It contemplates removal of suits against officers or their agents for acts that were not done under color of their offices, so long as the suits "relat[e] to" such acts.  Louisiana's interpretation would leave the "relating to" requirement with little, if any, independent function.  As the Fifth Circuit explained, Louisiana's interpretation "impermissibly conflates the 'distinct' 'acting under' and 'connected or associated with' elements of the federal officer removal test."  103 F. 4th, at 335.  We generally do not read a statute "in a way that makes part of it redundant."  *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 669 (2007).

## III

The Fifth Circuit erred in concluding at this stage that the suit against Chevron was not "for or relating to" its performance of federal duties.  Accordingly, we vacate the judgment of the Fifth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the decision of this case.

# SUPREME COURT OF THE UNITED STATES

———————

No. 24–813

———————

## CHEVRON USA INCORPORATED, ET AL., PETITIONERS *v.* PLAQUEMINES PARISH, LOUISIANA, ET AL.

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT*

[April 17, 2026]

JUSTICE JACKSON, concurring in the judgment.

The Court correctly holds that the underlying lawsuit is "for or relating to" Chevron's acts done "under color of [federal] office." 28 U. S. C. §1442(a)(1); see *ante,* at 12. But I disagree with the majority's conclusion that the federal officer removal statute's "for or relating to" language requires only an indirect relationship between the conduct targeted by the lawsuit and the asserted federal duties. See *ante,* at 7–8. In my view, the statute demands more.

Understood in the context of its statutory and legislative history, §1442(a)(1) requires a causal nexus between the targeted conduct and the federal duties, as I explain below. Chevron satisfies the causal-nexus requirement on the facts presented here, so I agree that the Fifth Circuit's ruling must be vacated. I therefore respectfully concur only in the majority's judgment.

## I

### A

Since 1948, Congress has authorized federal officers, and people acting under federal officers, to remove lawsuits brought "for any act under color of [federal] office." Act of June 25, 1948, §1442(a)(1), 62 Stat. 938. We interpreted this statutory language to require "a causal connection

between the charged conduct and asserted official authority." *Willingham* v. *Morgan*, 395 U. S. 402, 409 (1969) (internal quotation marks omitted).  In other words, we held that the federal directive giving rise to the authority to act must be a but-for cause of the conduct challenged by the lawsuit.  See *Maryland* v. *Soper*, 270 U. S. 9, 33 (1926) (explaining that, under a similar statute, a federal official could remove a prosecution to federal court if the case was "based on or arises out of the acts he did under authority of federal law in the discharge of his duty and only by reason thereof"); accord, *Willingham*, 395 U. S., at 409.

Congress amended the federal officer removal statute in 2011, adding the "or relating to" language.  See Removal Clarification Act of 2011, §2(b), 125 Stat. 545.  The question the Court answers today is what this addition means.

## B

In responding to this inquiry, the majority considers in isolation the "ordinary meaning" of the phrase "relating to." *Ante,* at 8 (internal quotation marks omitted).  Based on our case law interpreting that phrase in other contexts, the majority concludes that this language requires only an indirect relationship between the conduct alleged in the lawsuit and the asserted federal duties.  *Ante,* at 7–9.  Accordingly, in the majority's view, Congress's addition of "or relating to" jettisoned the causal-nexus test in favor of a looser standard.  *Ante,* at 8, and n. 3.

I think the Court should interpret the "relating to" addition primarily by determining what Congress intended to accomplish with this amendment.  *Learning Resources, Inc.* v. *Trump*, 607 U. S. ___, ___–___ (2026) (JACKSON, J., concurring in part and concurring in judgment) (slip op., at 1–2).  Indeed, the Court's "fundamental task" in interpreting federal statutes is to give effect to Congress's intent.  R. Katzmann, Judging Statutes 31 (2014) (Katzmann); see *Pennington* v. *Coxe*, 2 Cranch 33, 59 (1804) (opinion for the

Court by Marshall, C. J.) ("It is the duty of the court to discover the intention of the legislature, and to respect that intention"). And the Court faithfully discharges this duty when it considers all reliable evidence of Congress's intent—including statutory and legislative history. See *United States* v. *Hansen*, 599 U. S. 762, 775 (2023) ("Statutory history is an important part of [the] context" in which we interpret text); Katzmann 38 ("Legislative history . . . can help [judges] understand what the law means").

Here, the statutory and legislative history is clear: Congress did not set out to change the causal-nexus requirement with its 2011 amendment. Rather, the "relating to" addition was motivated by a problem entirely separate from the causal-nexus requirement.

At the time of the amendment, 40 States had laws authorizing private parties to compel document production or depositions before they commenced a lawsuit. See Removal Clarification Act of 2010: Hearing on H. R. 5281 before the Subcommittee on Courts and Competition Policy of the House Committee on the Judiciary, 111th Cong., 2d Sess., 1 (2010) (House Hearings).* Federal officers were sometimes the target of such presuit discovery proceedings. H. R. Rep. No. 112–17, pt. 1, pp. 3–4 (2011) (H. R. Rep.). Courts were split, however, on whether federal officers could remove presuit discovery proceedings to federal court under §1442(a)(1). House Hearings, at 1–2; compare *Price* v. *Johnson*, 600 F. 3d 460, 462 (CA5 2010) (reviewing District Court order determining such a proceeding was not removable), with *In re Subpoena In Collins*, 524 F. 3d 249, 251 (CADC 2008) (determining such a proceeding was removable).

---

*The House Hearings were for a predecessor bill proposed the year before the Removal Clarification Act was passed. That predecessor bill included the "or relating to" language that was ultimately enacted. See H. R. 5281, 111th Cong., 2d Sess., §2(b)(2) (2010).

Congress amended the federal officer removal statute to clarify that presuit discovery proceedings targeting federal officers were removable. H. R. Rep., at 4. Congress made substantive changes to that end; for example, it specifically stated that "any proceeding" in which "a judicial order, including a subpoena for testimony or documents, is sought or issued" was removable. §2(a)(1), 125 Stat. 545 (codified at 28 U. S. C. §1442(d)(1)); see H. R. Rep., at 4.

Congress also made several "conforming amendments." §2(b), 125 Stat. 545. The addition of the "or relating to" language to §1442(a)(1) was one of them. 125 Stat. 545 (referring to this change as a "conforming amendment"); accord, House Hearings, at 44 (describing this as a "minor chang[e] to existing §1442(a) [to] make it consistent" with the substantive changes). The addition of "or relating to" was not a substantive change.

C

That the addition of "or relating to" was a "conforming amendment" is meaningful. Congress rarely changes the substance of a statute through "mere conforming amendment[s]." *INS* v. *Stevic*, 467 U. S. 407, 428 (1984). Such amendments are typically "minor tweak[s]," intended to harmonize or clarify amended statutory provisions. *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U. S. 416, 430 (2018); accord, *Stevic*, 467 U. S., at 428. Thus, it would be passing strange to conclude that "Congress made a radical—but entirely implicit—change" to the standard for federal officer removal through a conforming amendment. *Director of Revenue of Mo.* v. *CoBank ACB*, 531 U. S. 316, 324 (2001).

And indeed, the legislative history here confirms that Congress did no such thing. It makes crystal clear that the Removal Clarification Act was "not changing the underlying removal law," but was instead simply clarifying that §1442 would apply "anytime a legal demand is made on a

Federal officer for any act done under their official capacity." House Hearings, at 2; see *id.*, at 13 (testimony of the House General Counsel that the bill "does not alter the standard for general removal for Federal officer removal under [§]1442"); *id.*, at 17 ("[U]nder the terms of the bill . . . , each of the currently existing requirements of the federal officer removal statute still must be met for removal to be permitted"); 157 Cong. Rec. 2792 (2011) (statement of Rep. Jackson Lee that the bill "does not make any changes to the underlying removal law"). Moreover, the history establishes that Congress *knew* the removal law it was amending required a causal nexus. See H. R. Rep., at 3 ("Federal officers . . . must demonstrate a causal connection between the charged conduct and asserted official authority"). So, with full knowledge of the causal-nexus test, Congress made only a "conforming" change—it did not alter the substantive requirements for removal.

This is not to say that the "or relating to" language served no purpose. By adding it, Congress confirmed that subpoena enforcement and presuit discovery proceedings "fall within the scope of Section 1442." House Hearings, at 20 (testimony of the House General Counsel).

The nature of presuit discovery proceedings necessitated such confirmation. Presuit discovery proceedings seek to get information, not to accuse the target of engaging in unlawful conduct. Thus, to describe a subpoena or a deposition as being "for" unlawful conduct is factually inaccurate. If the statute permitted removal of only those proceedings that are "for" federally directed conduct, then arguably that statutory provision would not authorize removal of presuit discovery proceedings. But presuit discovery proceedings *are* "related to" a defendant's federally directed conduct. See Brief for Former Governor John Bel Edwards as *Amicus Curiae* 12–13. So, "[b]ecause the amended §1442 would now include proceedings that do not seek to impose civil liability or a criminal penalty on the federal officer, [the

statute] allows removal not only in proceedings 'for' acts under color of the federal office but also in proceedings 'relating to' such acts." House Hearings, at 68 (statement of Arthur D. Hellman, University of Pittsburgh School of Law).

In short, by adding "or relating to," Congress confirmed that the substantive changes "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court." H. R. Rep., at 6. The amendment clarified that presuit discovery proceedings were squarely within "the universe of acts" that a federal officer could remove. But Congress did not intend to change any of the underlying removal requirements—including the causal-nexus test.

## II

Although the majority and I interpret the "for or relating to" requirement differently, we agree that the state lawsuit here satisfies this requirement. The lawsuit targets Chevron's crude-oil production activities. And as the majority explains, Chevron's predecessor contracted with the Federal Government during the Second World War to produce aviation gasoline ("avgas"), a product refined from crude oil. *Ante,* at 3–4.

Chevron used much of the crude oil it pumped from its Louisiana oil fields to refine into avgas during the war. This was no accident. The crude oil from Chevron's Louisiana fields was particularly well-suited for refining into avgas, and the Federal Government pushed its refiners, including Chevron, to produce more and more avgas. *Ante,* at 10. This in turn demanded an ever-increasing supply of crude oil. *Ibid.* Chevron therefore produced crude oil, at least in part, to meet the demands of its federal contracts— satisfying the causal-nexus requirement.

The Fifth Circuit erred in concluding that the removal statute's "for or relating to" requirement was not met under the circumstances presented here. It faulted Chevron for failing to identify a specific contractual directive

"pertaining to oil production." *Plaquemines Parish* v. *BP America Production Co.*, 103 F. 4th 324, 341 (2024). But Chevron's federal contracts can be a but-for cause of the challenged crude-oil production without specifically directing that production. Because the Fifth Circuit's contractual-directive demand goes a step further than even the causal-nexus test, I agree with the majority that the Fifth Circuit's judgment must be vacated.